# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Joshua Kelly,
    *Plaintiff*,

    v.

Antonio Santiago, et al.,
    *Defendant*.

No. 3:18-cv-01796-VAB

## INITIAL REVIEW ORDER AND RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR ORDER TO SHOW CAUSE ON PRELIMINARY INJUNCTION

Joshua Kelly ("Plaintiff") has sued Director of Security Antonio Santiago, Security Risk Group Coordinator John Aldi, Lieutenant J. Russell, Disciplinary Hearing Officer King, District Administrator Edward Maldonado, and Warden Mulligan (collectively "Defendants") under 42 U.S.C. § 1983 for alleged violations of his First, Fifth, Eight, and Fourteenth Amendment rights under the United States Constitution and Sections Four, Five, Seven, Eighth, Nine and Twenty of Article First of the Connecticut Constitution because of his security classification and the conditions of his confinement at New Haven Correctional Center. Complaint, ECF No. 1 ("Compl.").

Since the filing of this lawsuit, Mr. Kelly has since been moved to the MacDougall-Walker Correctional Institution and Corrigan-Radgowski Correctional Center.

On February 7, 2019, Mr. Kelly filed a motion for a temporary restraining order and a motion for an order to show cause why a preliminary injunction should not issue, seeking damages, declaratory relief, and a preliminary injunction prohibiting the defendants from

keeping Mr. Kelly confined in the Security Risk Group.[1]

For the following reasons, Mr. Kelly's First Amendment and Fourteenth Amendment claims may proceed, however, the Court **DISMISSES** Mr. Kelly's other federal constitutional claims, **DISMISSES** Mr. Kelly's official capacity claims for monetary damages, and **DECLINES** to exercise supplemental jurisdiction over his state constitutional claims.

The Court also **DENIES** Mr. Kelly's motion for a temporary restraining order but **GRANTS** Mr. Kelly's motion for an order to show cause on the preliminary injunction.

The Court also **ORDERS** the defendants to respond to the order to show cause as to why the Court should not grant Mr. Kelly's temporary restraining order and preliminary injunction should by **September 13, 2019**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations

In 2015, prison officials designated Mr. Kelly to the Security Risk Group and he successfully completed the Security Risk Group program. Statement of Case, Compl. at ¶ 6.

On June 11, 2018, Mr. Kelly was incarcerated in New Haven Correctional Center. *Id*. at ¶ 1.

On June 20, 2018, prison officials brought Mr. Kelly to the Restrictive Housing Unit ("RHU"),[2] pending an investigation into alleged gang affiliation. *Id*. at ¶ 2. Prison officials allegedly used Mr. Kelly's social media posts to designate him as a Security Risk Group

---

[1] MacDougall-Walker Correctional Institution defines a Security Risk Group as "a group of inmates possessing common characteristics distinguishing them from other inmates or groups of inmates that has been designated by the Commissioner as posing a threat to the safety of staff, the facility, other inmates, or the community in accordance with A.D. 6.14, Security Risk Groups." MacDougall-Walker Correctional Institution, *MacDougall-Walker Correctional Institution Inmate Handbook* 17, https://www.law.umich.edu/special/policyclearinghouse/Documents/CT%20-%20MacDougall%20Handbook.pdf.

[2] According to MacDougall-Walker Correctional Institution's policies, "[i]nmates assigned to Punitive Segregation status shall be housed in the Restrictive Housing Unit (RHU)." *Id*.

member, which Disciplinary Hearing Officer ("DHO") King allegedly did do. *See* Statement of Case, Compl. at ¶ 9, ¶ 4. District Administrator Mr. Maldonado relied on Administrative Directive 6.14 when segregating Mr. Kelly, based on an alleged finding that Mr. Kelly had affiliated with the Security Risk Group, the "Bloods." Legal Claims, Compl. at ¶ 3.

Two days later, Mr. Kelly went to a hearing after arriving at the Restrictive Housing Unit, Statement of Case, Compl. at ¶ 3, but he alleges that he never received a ticket, nor did officials give him an opportunity to make a plea, *id*. at ¶ 4.

After Mr. King designated Mr. Kelly to the Security Risk Group, he was sent to the MacDougall-Walker Correctional Institution ("Walker") to complete Phase Two. Statement of Case, Compl. at ¶ 11. At Walker, Mr. Kelly alleges that he could not take a shower more than three times each week, could have no contact visits, could not eat with others, and could not participate in any religious, educational, or social programming. Mr. Kelly alleges that prison officials limited his activity in other ways, including no hot water, restricting use the phone more than three times a week for fifteen minutes at a time, prohibiting day-room recreational center access during inclement weather, and banning electronic devices. Mr. Kelly alleges that he spends twenty-three to twenty-four hours in a cell each day. *Id*. at ¶¶ 13–24.

Additionally, Mr. Kelly alleges that gang members threatened him with death. *Id*. at ¶¶ 26–27. Mr. Kelly alleges that he is not a gang member, should be with other inmates not affiliated with gangs in general population, and his current placement is dangerous. *Id*. at ¶ 10.

### B. Procedural History

On November 2, 2018, Mr. Kelly filed his Complaint against Director of Security Antonio Santiago, Security Risk Group Coordinator John Aldi, Lieutenant J. Russell, DHO King, District Administrator Edward Maldonado, and Warden Mulligan, in their individual and

official capacities for security classifications made while at the new Haven Correctional Center. Compl. At the time of the Complaint, Mr. Kelly had been confined at MacDougall-Walker Correctional Institution. Statement of Case, Compl. at ¶ 4.

On December 26, 2018, Mr. Kelly notified the Court of his transfer from the MacDougall-Walker Correctional Institution to the Corrigan-Radgowski Correctional Center. Notice, ECF No. 11.

On February 7, 2019, Mr. Kelly filed a motion for an order to show cause and a motion for a temporary restraining order and injunction. Mot. for Order to Show Cause for TRO and Prelim. Inj., ECF No. 12.

## II.    STANDARD OF REVIEW

### A.    Section 1915 Review

The Court must "review . . . a complaint in a civil action in which a prisoner seeks redress from a government entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). The Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint," if the complaint or any of its parts are "frivolous, malicious, or fails to state a claim upon which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief." *Id*. at § 1915A(b).

The Federal Rules of Civil Procedure require that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555,

570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). Although the rules of civil procedure do not require "detailed

factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic

recitation of the elements of a cause of action," or "naked assertion[s] devoid of "further factual

enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless

distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and

unlikely." *Id*. at 556 (internal quotation marks omitted).

Pro se complaints, however, "must be construed liberally and interpreted to raise the

strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013)

(quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal

quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010)

(discussing the "special solicitude" courts afford pro se litigants).

### B.      Preliminary Injunction

Preliminary injunctive relief "is an extraordinary and drastic remedy . . . that should not

be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v.*

*Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and

citation omitted). To show entitlement to a preliminary injunction, the moving party must

demonstrate (a) that he or she will suffer "irreparable harm" in the absence of an injunction, and

(b) either (1) a "likelihood of success on the merits or (2) sufficiently serious questions going to

the merits [of the case] to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405–06 (2d Cir. 2011) (internal quotation marks and citation omitted).

For irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations and internal quotation marks omitted); *see also L.A. v. Lyons*, 461 U.S. 95, 111–12 (1983) (holding that a court cannot find injunctive relief if the claimed injury is speculative or remote). "The relevant [irreparable] harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction . . . . Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d. Cir. 2010).

### C.    Temporary Restraining Order

In the Second Circuit, "[t]he same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order." *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264 (N.D.N.Y. 2015); *Local 1814 Int'l Longshoreman's Ass'n v. N.Y. Shipping Assoc., Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (recognizing that the standard for a temporary restraining order is the same as preliminary injunction standard). Irreparable harm is the "most significant condition which must be present to support the granting of a temporary injunction." *Capital City Gas Co. v. Phillips Petroleum Co.*, 373 F.2d 128, 131 (2d Cir. 1967) (citation omitted); *Reuters Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) ("the moving party must first demonstrate that [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered"). As with a request for preliminary injunctive relief, the moving party must show irreparable harm

that is "not remote or speculative but actual and imminent." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F. 2d 70, 72 (2d Cir. 1979) (internal citations omitted).

## III. DISCUSSION

Mr. Kelly alleges that Defendants violated his First, Fifth, Eighth, and Fourteenth Amendment rights. In addition, Mr. Kelly alleges several Connecticut Constitution violations and seeks a temporary restraining order.

As a result, the Court will address the federal constitutional claims, state-law claims, and temporary restraining order in turn.

### A. Eleventh Amendment

A claim against an individual in his official capacity, "generally represents[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citing *Monell v. N.Y.C. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id*. at 166. Absent consent from a state, the Eleventh Amendment bars damages claims against it or entities constituted under its authority. *See Quern v. Jordan*, 440 U.S. 332, 240 (1979) ("[t]here can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless [State] has consented to the filing of such a suit.").

As an initial matter, Mr. Kelly alleges that Defendants are Connecticut Department of Correction employees. To the extent that Mr. Kelly seeks monetary damages from Defendants in their official capacities, the Eleventh Amendment bars those claims. *See Graham*, 473 U.S. at 165–66; *Quern*, 440 U.S. at 342.

Moreover, Section 1915 requires the Court to dismiss all claims seeking monetary

damages against defendants in their official capacities. 28 U.S.C. §1915A(b)(2) ("[o]n review, the court shall . . . dismiss the complaint, or any portion of the complaint, if the complaint . . . seeks monetary relief from the defendant who is immune from such relied.").

Accordingly, the Court dismisses Mr. Kelly's claims against the Defendants for monetary damages in their official capacities.

## B. Federal Constitutional Claims

"Section 1983 permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court." *Wimmer v. Suffolk Cty. Police Dep't*, 176 F. 3d 125, 136 (2d Cir. 1999); *see also Richardson v. McKnight*, 521 U.S. 399, 403 (1997). To prevail in a § 1983 claim, a plaintiff "must prove that the challenged conduct was attributable at least in part to a person acting under color of state law" and "that the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Wimmer*, 176 F. 3d at 136.

As a threshold inquiry for Section 1983 claims, the Court should precisely identify the constitutional violation alleged. *See Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("before the relationship between the defendant's state of mind and his liability under § 1983 can be meaningfully explored, it is necessary to isolate the precise constitutional violation with which he is charged.").

Here, Mr. Kelly claims that defendants violated his First, Fifth, Eighth, and Fourteenth Amendment rights.

### 1. First Amendment

"To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the

defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

Mr. Kelly claims that Mr. Russell violated his First Amendment right to freedom of expression by punishing him for portrayals made on his social media when Russell placed him in the Restrictive Housing Unit while an investigation for his Security Risk Group placement was pending. Legal Claims, Compl. at ¶ 1. Mr. Kelly also argues that DHO King violated his First Amendment right to freedom of expression by placing Mr. Kelly in the Security Risk Group based on his social media posts. Statement of Case, Compl. at ¶ 5.

Mr. Kelly further alleges that Mr. Maldonado violated his First Amendment right to free expression because he denied Mr. Kelly's appeal based on his Facebook posts, which allegedly indicate that Mr. Kelly was affiliated with Security Risk Group bloods. Legal Claims, Compl. at ¶ 3.

In addition, Mr. Kelly argues that Aldi and Santiago, as the supervisors of Russell, King, and Maldonado, have violated his rights because they were aware of the alleged misconduct, encouraged it, and failed to correct the misconduct that Defendants Russel, King, and Maldonado demonstrated. *Id*. at ¶ 4.

Finally, Mr. Kelly argues that Mr. Mulligan violated his First Amendment right to freedom of expression by housing him in the Security Risk Group based on Mr. Kelly's social media posts. *Id*. at ¶ 5.

The Court agrees.

The Supreme Court has recognized a First Amendment interest in posting on social media. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) ("by prohibiting

[offenders] from using [social media] websites, North Carolina with one broad stroke bars access to what for many are the principal sources for . . . speaking and listening in the modern public square . . . . They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.' In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." (citing *Reno v. ACLU*, 521 U.S. 844, 870, (1997)).

"In the context of a First Amendment retaliation claim" the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d. Cir. 2001). Courts tailor the objective inquiry to determine adverse action to the circumstances of the retaliation claim. *Id.* at 493 (finding that the definition of adverse action "is not static across contexts," but "must be tailored to the different circumstances in which retaliation claims arise. Prisoners may be required to tolerate more than public employees . . . before a retaliatory action taken against them is considered adverse." (internal quotation marks and citation omitted)).

Here, Mr. Kelly has stated a plausible claim that prison officials violated his First Amendment rights for three reasons.

First, the First Amendment protects Mr. Kelly's speech interest in posting on his Facebook page. *See Packingham*, 137 S. Ct. at 1737 (recognizing that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights").

Second, Mr. Kelly has alleged facts that are sufficient to state a claim that the defendants took adverse actions against him by placing him in the Security Risk Group and depriving Mr. Kelly of basic privileges, such as decreased cell time, *see* Statement of Case, Compl. at ¶ 15, reduced showers, *id*. at ¶ 13, reduced phone time, *id*. at ¶ 24, and limited recreation, *id*. at ¶ 19. Taking Mr. Kelly's allegations as true, the Defendants' conduct would deter an individual of ordinary firmness from engaging in speech on their social media for fear that prison officials may use those statements against them in future detention decisions as a pretrial detainee. *See Hayes v. Santiago*, No. 3:18-cv-01758 (JAM), 2018 WL 5456494, at *3 (D. Conn. Oct. 29, 2018) (finding a plausible retaliation claim against prison officials after the officials placed a pretrial detainee in segregation based on his social media posts); *see also Scozzari v. Santiago*, No. 3:19-cv-00229 (JAM), 2019 WL 1921858, at *4 (D. Conn. Apr. 29, 2019) (finding a plausible retaliation claim against prison officials after the officials placed a pretrial detainee in segregation based on his Facebook posts).

Third, Mr. Kelly has alleged facts sufficient to state a claim that Mr. Kelly's Facebook posts caused the defendants to place him in the Security Risk Group. In fact, Mr. Kelly has alleged that it was the Defendants who told him that he was placed in the Security Risk Group because of his social media posts. *See* Legal Claims, Compl. at ¶ 3 ("Defendant Maldonado denied my appeal and stated that based on my Facebook postings [] I'm affiliated with [Security Risk Group] Bloods."); *see also id*. at ¶ 1 ("Defendant Russell stated that [the] New Haven intelligence unit had pictures and statu[s]es of me on my social media" and "placed me in [Restrictive Housing Unit] pending investigation for [Security Risk Group]."); *see also id*. at ¶ 2 ("King was deliberate[ly] indifferent to my civil rights because she knew that social media had nothing to do with D.O.C. and disregarded my fights . . ."); *see also id*. at ¶ 4 ("Defendants Aldi

and Santiago . . . [are] compelling their subordinates [Russell, King, and Maldonado] to use ready-made language [to] deny[] [inmates] a chance to challenge their designation.").

Accordingly, the Court finds that Mr. Kelly stated a plausible First Amendment retaliation claim that Defendants took adverse actions against Mr. Kelly by confining him to segregation because of his protected speech on social media. The Court therefore will allow Mr. Kelly's First Amendment retaliation claim to proceed.

### 2. Fifth Amendment

The Fifth Amendment provides: "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. While "[t]he Due Process Clause of the Fifth Amendment prohibits the United States, [] the Due Process Clause of the Fourteenth Amendment prohibits the States from depriving any person of liberty without "due process of law." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Ambrose v. N.Y.C.*, 623 F. Supp. 2d 454, 466–67 (S.D.N.Y. 2009) (finding a due process claim against a city was "properly brought under the Fourteenth Amendment, not the Fifth Amendment").

Here, Mr. Kelly has not alleged facts to state a claim under the Fifth Amendment because he is in the custody of the Connecticut Department of Corrections, not the Federal Bureau of Prisons.

Accordingly, the Complaint fails to plead a plausible Fifth Amendment violation, and the Court dismisses his Fifth Amendment claim.

### 3. Eighth Amendment Claim

In cases where "the State seeks to impose punishment without an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id*; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("[t]he rights of one who has not been

convicted are protected by the Due Process Clause . . . it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."). Pretrial detainees' claims are evaluated under the Due Process Clause and not the Cruel and Unusual Punishment Clause of the Eighth Amendment because "a person lawfully committed to pretrial detention has not been adjudged guilty of any crime, and thus, under the Due Process Clause, may not be punished in any manner—neither cruelly and unusually nor otherwise." *Benjamin v. Fraser*, 343 F. 3d 35, 49–50 (2d Cir. 2003).

Mr. Kelly argues that his confinement conditions violate the Eighth Amendment as "cruel and unusual" punishment. Statement of Case, Compl. at ¶ 36. Specifically, Mr. Kelly argues that Mr. Mulligan violated his right by exercising deliberate indifference to his health and safety by housing him in conditions that cause Mr. Kelly "psychological harm, stress, misery and depression." Legal Claims, Compl. at ¶ 5; Statement of Case, Compl. at ¶ 25. In addition, Mr. Kelly argues that gang members began to threaten him with death at MacDougall-Walker Correctional Institution and that prison officials have violated his right because they are responsible for putting him in harm's way. Statement of Case, Compl. at ¶ 26–7.

The Court disagrees.

Here, the Complaint fails to plead a plausible Eighth Amendment violation because the State of Connecticut has not convicted Mr. Kelly of a crime. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Id.*

Accordingly, the Complaint fails to plead a plausible Eighth Amendment violation, and the Court dismisses his Eighth Amendment claim.

### 4. Fourteenth Amendment Due Process Claim

Mr. Kelly argues that Mr. King violated his Fourteenth Amendment due process rights by not following protocol and improperly designating Mr. Kelly to the Security Risk Group Statement of Case, Compl. at ¶ 4. Mr. Kelly claims that Mr. King was being arbitrary and capricious by designating him to the Security Risk Group without an opportunity to challenge why officials should not designate him in the Security Risk Group. Legal Claims, Compl. at ¶ 2.

Mr. Kelly also contends that Mr. Russell violated his Fourteenth Amendment due process rights by placing him in Restrictive Housing Unit without due process. Legal Claims, Compl. at ¶ 1. Mr. Kelly alleges that his pretrial detainee status should preclude him from Walker's Phase Two program housing. Statement of Case, Compl. at ¶ 32.

Mr. Kelly further argues that Mr. Maldonado violated his Fourteenth Amendment due process rights by denying his appeal "based on Facebook posting that [Mr. Kelly is] affiliated with SRG Bloods." Legal Claims, Compl. at ¶ 3.

Finally, Mr. Kelly claims that Mr. Aldi and Mr. Santiago violated his Fourteenth Amendment due process rights by requiring their subordinated to use "ready-made language" to "deny [inmates] a chance to challenge their designation." *Id.* at ¶ 4.

Mr. Kelly has not stated a due process claim against Mr. Mulligan.

Here, there are two avenues for Mr. Kelly to assert a plausible Fourteenth Amendment claim: (a) substantive due process, or (b) procedural due process.

### a. Substantive Due Process

"A pretrial detainee can establish a due process claim for inhumane conditions of

confinement either by providing an official's deliberate indifference to those conditions, or by providing that those conditions are punitive." *Darnell v. Pineiro*, 849 F.3d 17, 34 n.12 (2d. Cir. 2017) (citing *Fraser*, 343 F.3d at 50).

### i. Deliberate Indifference

"A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether . . . by deliberate indifference to conditions of confinement, or otherwise." *Darnell*, 849 F.3d at 35. Under the deliberate indifference standard, a pretrial detainee must satisfy both objective and subjective criteria.

First, the pretrial detainee must satisfy the "'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process . . . ." *Darnell*, 849 F.3d at 29.

To establish an objective deprivation under the Fourteenth Amendment, "'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.'" *Darnell*, 849 F.3d at 30 (citing *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the condition themselves must be evaluated in light of contemporary standards of decency.'" *Id.* The standards for evaluating objective deprivations depend on "severity and duration" and "not the detainee's resulting injury." *Id.* In addition, the analysis should take place on a "case-by-case-basis," *id*. at 30, and "the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another, *id*. at 32 ("[a]n overcrowded cell, for example, may exacerbate the effect of unsanitary conditions.").

Here, Mr. Kelly has asserted facts sufficient to show that his conditions of confinement were serious to constitute objective deprivations. While assigned to the Security Risk Group program at Walker, Mr. Kelly alleges that he had to remain in his cell for twenty-three hours a day during the week-days and twenty-four hours a day on Saturdays and Sundays, *see* Statement of Case, Compl. at ¶ 15, abstain from recreation or do so in inclement weather, *see id*. at ¶ 19, eat all meals in his cell, *see id*. at ¶ 16, and take no more than three showers a week, *see id*. at ¶ 13, in an unsanitary shower stall with feces, blood, and dirt, *see id*. at ¶ 23.

Additionally, Mr. Kelly alleges that he could not watch television, *see id*. at ¶ 20, participate in congregate religious services or educational or social programs, *see id*. at ¶¶ 16–7, engage in contact visits, *see id*., make more than three telephone calls a week, *see id*. at ¶ 24, or receive visits from anyone other than his immediate family members, *see id*. at ¶ 35. Mr. Kelly further alleges other Security Risk Group inmates in the program threatened to harm Mr. Kelly. *See id.* at ¶ 26. Mr. Kelly asserts that these conditions in the Security Risk Group program caused him to experience "psychological harm, stress, misery, and depression." *Id.* at ¶ 25.

When considered individually or collectively, Mr. Kelly's alleged conditions of confinement as a pretrial detainee are severe. *See Darnell*, 849 F.3d at 30. ("[c]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise."). These alleged conditions of confinement have deprived Mr. Kelly of identifiable human needs; namely communication, hygiene, and safety. Mr. Kelly therefore has alleged allegations sufficient to satisfy the objective prong.

Second, the pretrial detainee must satisfy the "subjective prong," also called the "*mens rea* prong" or "mental element prong" by "showing that the officer acted with at least deliberate

indifference to the challenged conditions." *Id.* at 30.

"[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition" or that the prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

Here, Mr. Kelly has stated facts sufficient to show that prison officials acted with deliberate indifference to his confinement by intentionally confining Mr. Kelly in the above-mentioned conditions. Mr. Kelly alleges that officials designated to the Security Risk Group program because his Facebook posts indicated that he was a gang member. Statement of Case, Compl. at ¶ 5. According to these allegations, the defendants intentionally designated Mr. Kelly to the program because they assumed he was a gang member. Further, under the Security Risk Group program, Mr. Kelly alleges that officials intentionally seized his property, *see id.* at ¶ 14, limited his showers to three per week, *see id.* at ¶ 13, and confined him to his cell for at least twenty-three hours a day, *see id.* at ¶ 15.

Alternatively, Mr. Kelly has stated facts sufficient to show that prison officials acted with deliberate indifference by "recklessly fail[ing] to act with reasonable care" to mitigate the risk that Mr. Kelly's conditions of imprisonment posed to him, even though the defendants should have at least known that the prison conditions posed an excessive risk to Mr. Kelly's health or safety.

A reasonable person should have known that forcing inmates to enjoy recreation under inclement weather without adequate protection, *see id.* at ¶ 19–20, could pose an excessive risk

to the inmate's health. A reasonable person should have known that forcing inmates to bathe in water with "blood, dirt, [and] feces" floating inside, *see id.* at ¶ 23, could pose an excessive risk to the inmate's health. A reasonable person should have known that confining an alleged non-gang member in solitary with alleged gang members, *see id.* at ¶¶ 26–7, would pose an excessive risk to the non-gang member. According to the allegations of the Complaint, however, Defendants did not act with reasonable care to mitigate these risks, instead they encouraged the above-mentioned deprivations. Legal Claims, Compl. at ¶ 3.

Accordingly, the Court finds that Mr. Kelly has stated a plausible substantive due process claim under the Fourteenth Amendment because the alleged conditions of confinement objectively deprived him of his right to due process and the alleged deliberate indifference of Defendants to the conditions of confinement.

### ii.     Punitive Action

The Supreme Court has held that pretrial detainees have a liberty interest not being punished by the conditions of their pretrial confinement. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"); *see also Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) ("restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee'").

In assessing whether state actions or restrictions on pretrial detainees comport with substantive due process, "[a] court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Without a showing of an "expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative

purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.'" *Id*. Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id*. at 539.

Conversely, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. Legitimate government objectives include "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees," "ensuring a detainee's presence at trial," and "manag[ing] the facility in which the individual is detained." *Bell*, 441 U.S. at 540.

When determining whether a condition or restriction is punitive, courts examine the following factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment – retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry . . . .

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (footnotes omitted); s*ee also Bell*, 441 U.S. at 537 ("[t]his Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may.").

In addition, courts must consider that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the

retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id*. at 547.

Here, the Court must determine whether Mr. Kelly's confinement to the Security Risk Group serves as punishment.

As an initial matter, Mr. Kelly alleges conditions that have "historically been regarded as a punishment." *Mendoza-Martinez*, 372 U.S. at 168. Mr. Kelly has remained alone in his cell for twenty-three hours a day. "[Solitary confinement] is itself an infamous punishment." *In re Medley*, 134 U.S. 160, 169 (1890).

Mr. Kelly then stated a plausible claim that many of the restrictions placed on him were not "reasonably related to [the] legitimate governmental objective[s]" of ensuring Mr. Kelly's presence at trial or securing safety in prison facilities. *Bell*, 441 U.S. at 539; *see Allah v. Milling*, 876 F. 3d 48, 58 (2d Cir. 2017) ("Defendants have not adequately explained how limiting Allah to a single, 15-minute phone call and a single, 30-minute, non-contact visit with an immediate family member per week . . . or permitting him to keep a radio but not a television, related to any security risk suggested by his disciplinary record."). Because the alleged restrictions here are "not reasonably related to a legitimate goal," the Court "permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539.

Mr. Kelly has also stated a plausible claim that many of the restrictions placed on him were excessive in relation to any legitimate governmental objectives. A court could find that Walker's alleged restrictions on Mr. Kelly were excessive, absent an individualized finding that Mr. Kelly was a threat to the government's legitimate objectives. *See Allah*, 876 F. 3d at 58

("although plausibly related to security concerns in general, [Inmate's confinement conditions] were so excessively harsh as to be punitive. [Inmate] was kept in solitary confinement for 23 hours a day for almost seven months. . . . He received 'absolutely no programming or counselling or therapy' during that period."); *id*. at 56 (find that a pretrial detainee's due process rights were violated because "[p]rison officials did not . . . make an individualized or specific finding of the risk that [inmate] may have presented . . . or any real determination or individualized assessment that Administrative Segregation was appropriate for [inmate] during that time period.").

Accordingly, the Court finds that Mr. Kelly has stated a plausible substantive due process claim under the Fourteenth Amendment and his substantive due process claim may proceed for now.

### b.  Procedural Due Process

A procedural due process claim "permits only an evaluation of whether Defendants' method for coming to their [Security Risk Group] determinations is sufficient." *See Proctor v. LeClaire*, 846 F. 3d 597, 608 (2d Cir. 2017).

"The level of procedural protection differs according to the purpose of the confinement." *Bolden v. Alston*, 810 F.2d 353, 357 (2d. Cir. 1987). Although "full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting," requirements do include "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Fraser*, 264 F.3d at 190 (applying the procedural due process standards required for convicted inmates to pretrial detainees (citing *Wolff v. McDonnell*, 418 U.S. 539, 561–570 (1974)). Administrative segregation is "appropriate when necessary to incapacitate an inmate who 'represents a security

threat' or to 'complete an investigation into misconduct charges.'" *Proctor*, 846 F.3d at 609

(citing *Hewitt*, 459 U.S. at 476).

Here, Mr. Kelly has stated a plausible claim that prison officials denied him an

opportunity to "prepare a defense" and "present witnesses and evidence." Mr. Kelly argues that

defendants did not follow protocol when they designated him to the Security Risk Group.

Although Mr. Kelly had a hearing and was notified of his offense orally, he alleges that officials

provided neither a ticket nor an opportunity to make a plea. Statement of Case, Compl. at ¶ 3–5;

*see also Wolff*, 418 U.S. at 564 ("[a]t least a brief period of time after the notice, no less than 24

hours, should be allowed to the inmate to prepare for the appearance before the Adjustment

Committee."). Based on the allegations in the Complaint, it is plausible that prison officials did

not give Mr. Kelly an opportunity to prepare a defense and present witnesses and evidence.

Accordingly, the Court finds that Mr. Kelly has stated a plausible procedural due process

claim under the Fourteenth Amendment and his due process claims against all alleged defendants

may proceed for now.

### C.    State Constitutional Violations

At their discretion, district courts "may decline to exercise supplemental jurisdiction over

a claim . . . if [] the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1).

The Second Circuit has explained that the decision to decline to exercise supplemental

jurisdiction over complex or first impression legal issues derives from the principles of

federalism and comity. *Seabrook v. Jacobson*, 153 F. 3d 70, 72 (2d Cir. 1996) ("Where a pendent

state claim turns on novel or unresolved questions of state law . . . principles of federalism and

comity may dictate that these questions be left for decision by the state courts.").

Here, Mr. Kelly argues that all defendants, except for Defendant Mulligan, violated

Sections Four, Five, Seven, Eight, Nine, and Twenty of Article First of the Connecticut constitution. Legal Claims, Compl. at ¶¶ 1–5.

1.    **Article First, Section Five**

Article First, Section Five provides that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." Conn. Const. art. 1, § 5.

When asked to create a remedy under state constitutional provisions, courts in this District have routinely declined to do so. As Judge Kravitz explained in *Lopez v. Smiley*, when he declined to exercise supplemental jurisdiction over claims for money damages, declaratory relief, and injunctive relief based on violations of Article First, *inter alia*, § 5:

> [Plaintiff]'s state constitutional claims are clearly novel, they are complex, and they are not well developed under Connecticut law. In light of the Connecticut Supreme Court's explicit statement in *Binette* that the Supreme Court did not intend to create a cause of action for money damages for every alleged violation of the Connecticut state constitution, *see* [*Binette v. Sabo*, 244 Conn. 23, 47, 710 A.2d 688 (1998)], and the fact that federalism and comity concerns strongly suggest that recognition of new state constitutional torts should be determined on a case-by-case basis by *Connecticut courts* in the first instance, this Court will refrain from exercising supplemental jurisdiction over all of [plaintiff]'s Connecticut constitutional claims (both those seeking monetary damages and those seeking injunctive or declaratory relief).

*Lopez v. Smiley*, 375 F. Supp. 2d 19, 26 (D. Conn. 2005).

Accordingly, the Court will not to exercise supplemental jurisdiction over Mr. Kelly's § 5 claim under the Connecticut Constitution nor any other related claim stemming from the Connecticut Constitution. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raises a novel or complex issue of State Law . . .").

2.    **Article First, Section Four**

Article First, Section Four provides that "[e]very citizen may freely speak, write, and

publish his sentiments on all subjects, being responsible for the abuse of that liberty." Conn. Const. art. 1 § 4.

Connecticut courts have recognized a private right of action under Article First, Section Four for declaratory or injunctive relief. *Lopez*, 375 F. Supp. 2d at 24 n.2 (collecting cases); *see also Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) (noting that the Connecticut Supreme Court has recognized private right of action under free speech clause of Connecticut Constitution, Article First, Sections Three through Five and Fourteen) (citation omitted). The Court, however, has not identified any state cases recognizing a claim for money damages under this constitutional provision. *See Lopez*, 375 F. Supp. 2d at 24 n.2; *Marshall v. Town of Middlefield*, No. 3:10-cv-1009(JCH), 2012 WL 601783, at *9 (D. Conn. Feb. 23, 2012) (finding no case in which a Connecticut court has recognized a claim for money damages under Article First, Section Four).

As the Connecticut Supreme Court has not recognized a private right of action under this provision for money damages, Mr. Kelly's claim "raises a novel or complex issue of State law," this Court therefore declines to exercise supplemental jurisdiction over this claim. *See* 28 U.S.C. § 1367(c); *see Lopez*, 375 F. Supp. 2d at 24–26 (refusing to exercise supplemental jurisdiction over an alleged claim for monetary damages under Article First, Section Four, among other state constitutional claims).

Although Mr. Kelly includes requests for declaratory and injunctive relief in his prayer for relief, his state claim is best adjudicated with state courts and the Court declines to exercise supplemental jurisdiction over this claim. *See* 28 U.S.C. § 1367(c).

Accordingly, the Court declines to exercise supplemental jurisdiction over this claim.

### 3. Article First, Sections Seven and Nine

Article First, Section Seven provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures." Conn. Const. art. 1 § 7. Article First, Section Nine provides "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const. art. 1 § 9.

The Connecticut Supreme Court has recognized a private right of action for money damages for violations of Article First, Sections Seven and Nine, the search and seizure provisions. *See Binette v. Sabo*, 244 Conn. 23, 49–50 (1998). That cause of action, however, is not all-encompassing. Connecticut courts have only recognized a private cause of action under these sections where the conduct alleged was extreme and egregious. *See*, *e.g.*, *Martin v. Brady*, 64 Conn. App. 433, 441 (2001) (holding that allegations that police pushed plaintiff to ground and smashed windows and doors did not constitute egregious conduct and, therefore, failed to state a claim under Article First, Sections Seven and Nine of the Connecticut Constitution).

To support his search and seizure claim, Mr. Kelly alleges that Defendants placed him in the Security Risk Group because of his Facebook posts and that they seized his electronics and hot pot. Statement of Case, Compl. at ¶ 14. Under *Martin*, these allegations do not appear to constitute extreme or egregious conduct that would support a claim for damages under Article First, Sections Seven and Nine of the Connecticut Constitution. In addition, Mr. Kelly has not asserted facts that the defendants illegally searched and seized his property.

Accordingly, determining whether seizure of Ms. Kelly's personal items was "extreme and egregious" is best adjudicated by state courts and the Court declines to exercise supplemental jurisdiction over this claim. *See* 28 U.S.C. § 1367(c).

### 4.     Article First, Section Eight

Article First, § Section Eight provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law . . . ." Conn. Const. art. 1 § 8.

The Connecticut Supreme Court, however, has not recognized a private right of action under this provision. *See Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 187–88 (D. Conn. 2015) (declining to exercise supplemental jurisdiction over state constitutional claim under Article First, Section Eight); *see also Doe v. Mastoloni*, No. 3:14-cv-718(CSH), 2016 WL 593439, at *17 (D. Conn. Feb. 1, 2016) (declining to exercise supplemental jurisdiction over state constitutional provisions, including Article First, Section Eight, where state courts have declined to recognize a private right of action) (citing cases).

Because the Connecticut Supreme Court has not recognized a private right of action under this provision, Mr. Kelly's claim "raises a novel or complex issue of State law." *See* 28 U.S.C. § 1367(c). The Court therefore declines to exercise supplemental jurisdiction over this claim.

### 5.     Article First, Section Twenty

Article First, Section Twenty provides "[n]o person shall be denied equal protection of the law not be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Conn. Const. art. § 20.

The Connecticut Supreme Court, however, has not recognized a private right of action under this provision. Significantly, courts in this District have routinely declined to exercise supplemental jurisdiction over the state constitutional claim stemming from this provision. *See Richard v. Strom*, No. 3:18-cv-1451 (CSH), 2018 WL 6050898, at *8 (D. Conn. Nov. 18) (citing

*Doe v. Mastolini*, 2016 WL 593439, at *16–*17 (D. Conn. Feb. 1, 2016) (declined to exercise

supplemental jurisdiction over Article First, § 20 where state courts have not recognized a

private right of action) (citing cases); *Crowley v. Town of Enfield*, No. 3:14-cv-01903 (MPS),

2015 WL 4162435, at *3 (D. Conn. Jul. 9, 2015) (declined to recognize a private right of action

under Article First, §20); *M.A. v. City of Torrington*, No. 3:10-cv-1890 (JBA), 2012 WL

3985166, at *4 (D. Conn. Sep. 10, 2012) (declined to recognize a cause of action under Article

First, § 20); *Silvera v. Connecticut Dep't of Corr.*, 726 F. Supp. 2d 183, 199 (D. Conn. 2010)

(declined to recognize a private right of action under Article First, § 20); *Marshall v. Town of

Middlefield*, No. 3:10-cv-1009 (JCH), 2012 WL 601783, at *9 (D. Conn. Feb. 23, 2012)

(declined to recognize a private right of action under Article First, § 20); *Ward v. Housatonic

Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) (stating, "[t]he Court finds

that there is no private cause of action for monetary damages under the equal protection and due

process provisions (Art. First, §§ 1, 8, and 20) of the Connecticut Constitution)).

Because the Connecticut Supreme Court has not recognized a private right of action

under this provision, Mr. Kelly's claim "raises a novel or complex issue of State law." *See* 28

U.S.C. § 1367(c). The Court therefore declines to exercise supplemental jurisdiction over this

claim.

### C. Temporary Restraining Order and Preliminary Injunction

#### 1. Injunctive Relief

"'[I]njunctive relief against a state official may be recovered only in an official capacity

suit' because '[a] victory in a personal-capacity action is a victory against the individual

defendant rather than against the entity that employs him.'" *Marsh v. Kirschner*, 31 F. Supp. 2d

79, 80 (D. Conn. 1998) (citations omitted).

As the Court cannot provide the requested injunctive relief against any of the Defendants in their individual capacities, the Court will dismiss Mr. Kelly's request for injunctive relief against the defendants in their individual capacities under 28 U.S.C. § 1915A(b)(1).

##### 2.     Temporary Restraining Order and Preliminary Injunction

"'In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.'" *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (citing *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)). The exception to this general principal provides that a claim will not be moot where the harm is capable or repetition and likely to evade review. *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."). However, "the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.

Here, Mr. Kelly motion for a preliminary injunction has alleged facts sufficient to state a claim for why the Government should be required to respond to his allegations. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d. Cir. 1984) (internal quotation marks and citation omitted) (stating that the district court's finding of irreparable harm that "arose from the possible deprivation of eight amendment rights" was not clearly erroneous and that the district court did not err in granting a preliminary injunction); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d. Cir. 1996) (stating that there is a "presumption of irreparable injury that flows from a violation of constitutional rights" and that "it is the *alleged*

violation of a constitutional right that triggers a finding of irreparable harm."); *Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F. 3d 738, 744–45 (2d Cir. 2000) ("while it may be true that the majority of cases in which we have based an irreparable harm finding on the alleged deprivation of a constitutional right have arisen in the First Amendment context, we have also found irreparable harm in the allegation of Fourth Amendment violations.").

Mr. Kelly has sufficiently alleged plausible claims against the defendants for First Amendment and Fourteenth Amendment rights, which is sufficient to satisfy a finding of irreparable harm. But there are not factual allegations to determine whether the balance of hardships weighs in favor of issuing a temporary restraining order. The Court recognizes that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . ." *Bell* 441 U.S. at 546. Given the nature of the defendants here, the balance of hardships ought to grant the defendants an opportunity to state any disputed facts. *See Kern v. Clark*, 331 F. 3d 9, 12 (2d Cir. 2003) ("[t]he existence of factual disputes necessitates an evidentiary hearing . . . before a motion for a preliminary injunction may be decided.") (internal quotation marks).

Accordingly, the Court denies Mr. Kelly's temporary restraining order but grants Mr. Kelly's request for an Order to Show Cause as to why Mr. Kelly's preliminary injunction should not be issued.

## IV. CONCLUSION

For the foregoing reasons, Mr. Kelly's First Amendment and Fourteenth Amendment claims may proceed, however, the Court **DISMISSES** Mr. Kelly's other federal constitutional claims, **DISMISSES** Mr. Kelly's official capacity claims for monetary damages, and **DECLINES** to exercise supplemental jurisdiction over state constitutional claims.

The Court also **DENIES** Mr. Kelly's motion for a temporary restraining order but **GRANTS** Mr. Kelly's motion for an order to show cause on the preliminary injunction.

The Court also **ORDERS** the defendants to respond to the order to show cause as to why the Court should not grant Mr. Kelly's temporary restraining order and preliminary injunction should by **September 13, 2019**.

## ORDERS

The court enters the following orders:

**(1)** The Clerk of the Court shall verify the current work addresses of: Lieutenant Russell, Disciplinary Hearing Officer King, District Administrator Maldonado, Security Risk Group Coordinator Aldi, Warden Mulligan and Security Director Santiago and mail a copy of the Complaint, this Order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address. On September 13, 2019, the Clerk shall report to the Court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**(2)** Defendants Russell, King, Maldonado, Aldi, Santiago, and Mulligan shall file their response to the Complaint, either an Answer or motion to dismiss by November 15, 2019. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

**(3)** Discovery, under Federal Rules of Civil Procedure 26 through 37, shall be completed by February 1, 2020. Discovery requests need not be filed with the court.

**(5)**     All motions for summary judgment shall be filed by April 13, 2020.

**(5)**     The Clerk shall send a courtesy copy of the complaint and this order to the

Connecticut Attorney General and to the DOC Legal Affairs Unit.

**(6)**     The parties must comply with the District of Connecticut "Standing Order Re:

Initial Discovery Disclosures" which will be sent to the parties by the Clerk. The order also can

be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

     **SO ORDERED** at Bridgeport, Connecticut this 6th day of August 2019.


     ___/s/ Victor A. Bolden_____
     VICTOR A. BOLDEN
     UNITED STATES DISTRICT JUDGE